Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Michael Vanunu (MV 4167)
Philip P. Nash (PN 0519)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (     )
GEICO CASUALTY COMPANY,

                              Plaintiffs,

                                                        **Plaintiff Demands a Trial by Jury**

            -against-

WALLEGOOD, INC., ALEKSANDER
CHERNYSHEV, JACOB KEUM, M.D., HONG PAK,
M.D., MELISSA EVANS, N.P., MINI MATHEW, N.P.,
and JOHN DOE DEFENDANTS 1-10,

                              Defendants.
------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     This action seeks to recover more than $171,000.00 that the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through Defendant, Wallegood, Inc. ("Wallegood").

2.      Wallegood is a retailer of DME and OD that is owned, operated and controlled by Aleksander Chernyshev ("Chernyshev"). In short, Chernyshev devised a scheme in conjunction with various healthcare providers, including Defendants Jacob Keum, M.D. ("Keum"), Hong Pak, M.D. ("Pak"), Melissa Evans, F.N.P. ("Evans"), and Mini Mathew, F.N.P. ("Mathew"), either directly or through others who are not readily identifiable to GEICO, to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon prescriptions for Fraudulent Equipment issued by various healthcare providers, including Keum, Pak, Evans, and Mathew (collectively, the "Referral Defendants"), Wallegood and Chernyshev (collectively the "Supplier Defendants") allegedly provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.      GEICO seeks to recover more than $171,000.00 that has been wrongfully obtained by the Supplier Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $468,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Wallegood because:

(i)      The Supplier Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with health care

providers, including the Referral Defendants, either directly or through third-party individuals not presently identifiable.

(ii)    The Supplier Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols with healthcare providers, including the Referral Defendants – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat the Insureds.

(iii)    The Supplier Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referral Defendants or other healthcare providers who are licensed to issue such prescriptions.

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent what was provided to Insureds.

(v)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Supplier Defendants could have received for the Fraudulent Equipment.

5.    The Defendants fall into the following categories:

(i)    Defendant Wallegood is a New York corporation that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for Fraudulent Equipment.

(ii)    Defendant Chernyshev owns, operates and controls Wallegood, and uses the corporation to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    Defendant Keum is a physician licensed to practice medicine in New York and issued prescriptions for Fraudulent Equipment in the names of automobile accident victims that received treatment at multi-disciplinary medical offices located at 9801 Foster Avenue, Brooklyn, New York (the "Foster Ave Clinic") and 535 Utica Avenue, Brooklyn, New York (the "Utica Ave Clinic"), which were provided to and used by the Supplier Defendants to bill New York automobile insurance companies, including GEICO.

(iv)     Defendant Pak is a physician licensed to practice medicine in New York and issued prescriptions for Fraudulent Equipment in the names of automobile accident victims that received treatment at the Foster Ave Clinic and Utica Ave Clinic, which were provided to and used by the Supplier Defendants to bill New York automobile insurance companies, including GEICO.

(v)     Defendant Evans is a Nurse Practitioner licensed to practice in New York and issued prescriptions for Fraudulent Equipment in the name of automobile accident victims who received treatment at a multi-disciplinary medical office located at 108 Kenilworth Place, Brooklyn, New York (the "Kenilworth Place Clinic"), which were provided to and used by the Supplier Defendants to bill New York automobile insurance companies, including GEICO.

(vi)     Defendant Mathew is a Nurse Practitioner licensed to practice in New York and issued prescriptions for Fraudulent Equipment in the name of automobile accident victims who received treatment the Kenilworth Place Clinic, which were provided to and used by the Supplier Defendants to bill New York automobile insurance companies, including GEICO.

6.     As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of unlawful financial arrangements between the Supplier Defendants and health care providers, including the Referral Defendants, either directly or through third-party individuals not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii)     The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols designed by the Defendants and other healthcare providers – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)     The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referral Defendants or other healthcare providers who are licensed to issue such prescriptions;

(iv)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS

Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(v)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently and grossly inflated the permissible reimbursement rate that the Supplier Defendants could have received for the Fraudulent Equipment.

7.    As such, the Supplier Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Wallegood.

8.    The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9.    Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than January 1, 2018 and the scheme has continued uninterrupted since that time.

10.    As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $171,000.00.

## THE PARTIES

I.    **Plaintiffs**

11.    Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.        **Defendants**

12.        Defendant Wallegood is a New York corporation with its principal place of business in Brooklyn, New York. Wallegood was incorporated on March 13, 2018, is owned, operated and controlled by Chernyshev, and has been used by Chernyshev, with the assistance of the Referral Defendants and others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.        Defendant Chernyshev resides in and is a citizen of New York.  Chernyshev is not and has never been a licensed healthcare provider. Chernyshev owns and controls Wallegood and entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals not presently identifiable, in exchange for referrals to Wallegood for the Fraudulent Equipment.

14.        Chernyshev is no stranger to fraudulent schemes against automobile insurers regarding DME/OD and has engaged in schemes against other New York automobile insurance carriers, including one nearly identical to the scheme identified here as being committed against GEICO.  Prior to owning Wallegood, Chernyshev was co-owner of Sigma Med Care, Inc. ("Sigma").  Chernyshev and Sigma were sued by GEICO in the District Court for the Eastern District of New York in an action entitled Government Employees Insurance Company et al. v. Sigma Med Care, Inc. et al., Case No. 1:18-cv-03018-DLI-RLM, in which it was alleged that Chernyshev and Sigma submitted hundreds of fraudulent claims to GEICO seeking payment for DME.  The case ultimately was resolved through a confidential settlement in 2018.

15.        Additionally, Chernyshev and Wallegood are both currently named defendants in a lawsuit brought by Allstate Insurance Company in the District Court for the Eastern District of New York entitled Allstate Insurance Company et al. v. David Abayev, et al., Case No. 1:20-cv-3302-WFK-RER, alleging a widespread No-Fault insurance fraud scheme involving multiple

DME/OD retailers operating to submit fraudulent billing for DME pursuant to a predetermined treatment protocol without regard for patient care.

16.     Defendant Keum resides in and is a citizen of New York. Keum became licensed to practice medicine in New York on or about February 19, 2003. Keum purportedly treated automobile accident victims through a healthcare practice entitled Metro Pain Specialists, P.C. ("Metro Pain") at multi-disciplinary medical offices that catered to a high volume of no-fault insurance patients, including the Foster Avenue Clinic and the Utica Avenue Clinic (collectively the "Metro Pain Clinics"). Keum was one of multiple healthcare providers who issued large numbers of prescriptions for Fraudulent Equipment from the Metro Pain Clinics that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

17.     Defendant Pak resides in and is a citizen of New Jersey. Pak became licensed to practice medicine in New York on or about July 9, 2018. Pak purportedly treated automobile accident victims through Metro Pain at multi-disciplinary medical offices that catered to a high volume of no-fault insurance patients, including the Metro Pain Clinics. Pak was one of multiple healthcare providers who issued large numbers of prescriptions for Fraudulent Equipment from the Metro Pain Clinics that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

18.     Defendant Evans resides in and is a citizen of New York. Evans was licensed as a nurse practitioner in New York on or about February 6, 2015. Evans purportedly treated automobile accident victims through Riverside Medical Services, P.C. ("Riverside") and Tristate Multi-Specialty, P.C. ("Tristate") at multi-disciplinary medical offices that catered to a high volume of no-fault insurance patients, including the Kenilworth Place Clinic.  Evans was one of multiple healthcare providers who issued prescriptions for Fraudulent Equipment from the

Kenilworth Place Clinic that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

19.     Defendant Mathew resides in and is a citizen of New York. Mathew was licensed as a nurse practitioner in New York on or about July 14, 2009.  Mathew purportedly treated automobile accident victims through Riverside and Tristate at multi-disciplinary medical offices that catered to a high volume of no-fault insurance patients, including the Kenilworth Place Clinic. Mathew was one of multiple healthcare providers who issued prescriptions for Fraudulent Equipment from the Kenilworth Place Clinic that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

20.     Defendants Evans and Mathew are also no strangers to fraudulent No-Fault schemes. Evans, Mathew, Riverside, and Tristate currently named as defendants in the United District Court for the Eastern District of New York action entitled <u>Government Employees Insurance Company et al. v. Alexandr Zaitsev, M.D. et al.</u>, Case No. 1:20-cv-03495-FB-SJB, which alleges Evans and Mathews submitted claims to GEICO for medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported examinations.

## <u>JURISDICTION AND VENUE</u>

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 <u>et seq.</u> (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

23.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

25.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws**

**A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

26.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

27.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

29.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

30.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

32.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

33.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". <u>See</u> N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

34.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

35.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

36.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

37.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

38.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

39.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

40.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle

11

stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

41.    OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

42.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

43.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

44.    As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2

45.     As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

46.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

47.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

48.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

49.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

50.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

51.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

52.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

53.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)    The prescription for DME or OD is not based any unlawful financial arrangement;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)    The fee sought for the DME or OD was not in excess of either the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

54.    Beginning in or about January 2018, the Defendants masterminded and implemented a complex fraudulent scheme in which Wallegood was used as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

### A.    Overview of the Defendants' Fraudulent Schemes

55.    Between April 2018 and November 2019, the last month for which GEICO received claims from Wallegood, the Supplier Defendants, through Wallegood, submitted more than $1,500,000.00 in fraudulent claims to GEICO seeking reimbursement for Fraudulent Equipment. To date, the Supplier Defendants have wrongfully obtained more than $171,000.00 from GEICO, and there is more than $468,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Supplier Defendants continue to seek payment of from GEICO.

56.    Chernyshev used Wallegood to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fee Schedule and Non-Fee Schedule items.

57.    As part of the scheme, and in a way to maximize the amount of money that the Supplier Defendants could obtain from GEICO, and other automobile insurers, the Supplier Defendants obtained generic and vague prescriptions for Fraudulent Equipment from the Referral Defendants and other healthcare providers who treated Insureds at multi-disciplinary medical offices in the New York metropolitan region that cater to high volumes of no-fault insurance patients, including the Foster Avenue, Utica Avenue, and Kenilworth Place Clinics (collectively

"the Clinics") that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1."

58.     Once the Supplier Defendants received the intentionally vague and generic prescriptions from healthcare providers, including the Referral Defendants, the Supplier Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions.

59.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Supplier Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

60.     However, in a substantial majority of the charges for Fee Schedule items identified in Exhibit "1" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment for Fee Schedule items did not match the HCPCS Codes identified in the bills submitted to GEICO by the Supplier Defendants.

61.     As part of this scheme, the Supplier Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment that did not contain all the features required by the HCPCS Codes for Fee Schedule items billed to GEICO, to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

62.     For example, in many instances, the Supplier Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of Fee Schedule items that could be provided to the Insureds. Then, the Supplier Defendants submitted bills to

GEICO that indicated the Supplier Defendants provided the Insureds with a variation that had a higher than necessary maximum reimbursement rate under the Medicaid Fee Schedule.

63.     However, the Fee Schedule items actually provided did not match the HCPCS Codes identified in the bills to GEICO as the items were of inferior quality and without the specific features required by the applicable HCPCS Codes.

64.     Instead, the Fee Schedule items actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the Supplier Defendants.

65.     The Supplier Defendants engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

66.     In furtherance of their scheme to defraud GEICO, and other automobile insurers, the Supplier Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Supplier Defendants' legitimate acquisition cost or the cost to the general public for the same item.

67.     In actuality, the bills from the Supplier Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Supplier Defendants' legitimate acquisition cost or the cost to the general public.

68.     As part of this scheme, the Supplier Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds

were expensive and high-quality when the Non-Fee Schedule items provided were cheap and poor-quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

69.     In fact, the cheap and poor quality Non-Fee Schedule items provided to the Insureds – again, to the extent that any Non-Fee Schedule item was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Supplier Defendants.

70.     The Supplier Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Non-Fee Schedule items at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

71.     The Supplier Defendants were able to perpetrate this scheme due to secret agreements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals who are not presently identifiable.

72.     Upon information and belief, in exchange for various forms of consideration from the Supplier Defendants – either directly or through third-party individuals who are not presently identifiable – the Referral Defendants and other healthcare providers would regularly and intentionally provide the same type of prescriptions for generic and vague Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident. Thereafter, someone on behalf of the Referral Defendants and other healthcare providers would typically – without going through the Insureds – provide the prescriptions to the Supplier Defendants.

73.     By providing generic and vague prescriptions to the Supplier Defendants, the Referral Defendants and other healthcare providers intentionally enabled the Supplier Defendants

to bill GEICO for: (i) Fraudulent Equipment that were not reasonable or medically necessary; (ii) Fraudulent Equipment that were not based on valid prescriptions from licensed healthcare providers; (iii) Fee Schedule items that did not represent the HCPCS codes contained in the bills to GEICO; (iv) Non-Fee Schedule items at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that were otherwise not reimbursable.

**B.    The Defendants' Illegal Financial Arrangements**

74.    Upon information and belief, in order to obtain access to Insureds so the Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits the Supplier Defendants could obtain from GEICO and other New York automobile insurers, the Defendants and other healthcare providers – either directly or through third parties who are not presently identifiable – entered into illegal agreements where prescriptions for Fraudulent Equipment were provided to the Supplier Defendants in exchange for financial consideration.

75.    Upon information and belief, since at least 2018, the Supplier Defendants engaged in unlawful financial arrangements with the Referral Defendants and other healthcare providers – either directly or through third parties who are not presently identifiable – in order to obtain prescriptions for Fraudulent Equipment. These schemes allowed the Supplier Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

76.    In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants – either directly or through third parties not presently

identifiable – as explained in detail below, the prescriptions were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

77.     In further keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, Chernyshev never met the healthcare providers who issued prescriptions that were provided to the Supplier Defendants.  Instead, the prescriptions for the Fraudulent Equipment were procured by Chernyshev as a result of arrangements that were facilitated by third-parties associated with healthcare providers at multi-disciplinary medical offices that catered to a high volume of no-fault insurance patients, including the Referral Defendants at the Clinics.

78.     In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements by the Supplier Defendants, the Supplier Defendants would frequently cash checks issued by GEICO at check cashing facilities at the same time that the Supplier Defendants had legitimate bank accounts at financial institutions.

79.     For example:

(i)     On August 16, 2018, GEICO issued a check for $502.63 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(ii)    On September 10, 2018, GEICO issued a check for $527.75 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(iii)   On October 5, 2018, GEICO issued a check for $372.37 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(iv)    On October 15, 2018, GEICO issued a check for $844.13 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(v)    On October 26, 2018, GEICO issued a check for $502.63 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(vi)    On October 29, 2018, GEICO issued a check for $1,009.16 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(vii)    On November 7, 2018, GEICO issued a check for $1,700.00 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(viii)    On November 19, 2018, GEICO issued a check for $782.29 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York;

(ix)    On November 26, 2018, GEICO issued a check for $782.29 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York; and

(x)    On December 17, 2018, GEICO issued a check for $923.43 that was issued to Wallegood, and was deposited at AVW Check Cashing located in Brooklyn, New York.

80.    These are only representative examples. Upon information and belief, the Supplier Defendants frequently cashed checks issued by GEICO, and other automobile insurers, at check cashing facilities in order to obtain cash that would be used to pay illegal kickbacks to healthcare providers, including the Referral Defendants – either directly or through third parties not presently identifiable.

81.    In also keeping with the fact that the Supplier Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, the Supplier Defendants (i) would receive virtually identical predetermined sets of prescriptions from multiple healthcare providers operating out of the same Clinic, including – as set forth below – the Referral Defendants operating at the Clinics; and (ii) obtain prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

82.     Upon information and belief, and in keeping with the fact that the prescriptions for Fraudulent Equipment were obtained directly from the Clinics and without any involvement by the Insureds, the prescriptions issued by the Referral Defendants and other healthcare providers were provided directly to the Clinics' receptionists who then submitted the prescriptions directly to the Supplier Defendants.

83.     Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, in many cases, the Insureds were provided with Fraudulent Equipment directly from the Clinics' without any interaction with the Supplier Defendants.

84.     In further support that the Fraudulent Equipment was provided without any interaction by the Supplier Defendants, statements provided to GEICO by Insureds confirmed that when Insureds were actually provided with Fraudulent Equipment, they received it directly from one of the Clinics, typically from the receptionists, without any involvement from the Supplier Defendants, and never received prescriptions for Fraudulent Equipment from a healthcare provider.

85.     For example:

(i)     On July 10, 2018, an Insured named MB was purportedly injured in a motor vehicle accident. Thereafter, MB received treatment at the Kenilworth Place Clinic. During an interview with a GEICO investigator, MB confirmed that: (i) MB received Fraudulent Equipment from the receptionist at the Kenilworth Place Clinic; and (ii) no one measured MB prior to receiving the Fraudulent Equipment.

(ii)    On August 7, 2018, an Insured named LM was purportedly injured in a motor vehicle accident. Thereafter, LM received treatment at a multi-disciplinary medical office located on Broadway in Brooklyn, New York. During an interview with a GEICO investigator, LM confirmed that LM received Fraudulent Equipment from the receptionist at the multi-disciplinary clinic located on Broadway in Brooklyn, New York.

(iii)   On August 10, 2018, an Insured named TR was purportedly injured in a motor vehicle accident. Thereafter, TR received treatment at the Kenilworth Place Clinic. During an interview with a GEICO investigator, TR confirmed that: (i) TR received Fraudulent Equipment from a receptionist at the Kenilworth Place Clinic; (ii) no

one measured TR prior to receiving the Fraudulent Equipment; (iii) TR was not given a choice where to acquire the Fraudulent Equipment; and (iv) no one at the Kenilworth Place Clinic followed up with TR to determine whether the Fraudulent Equipment was helping.

(iv)   On September 6, 2018, an Insured named PE was purportedly injured in a motor vehicle accident. Thereafter, PE received treatment at the Foster Avenue Clinic. During an interview with a GEICO investigator, PE confirmed that: (i) PE received Fraudulent Equipment from the receptionist at Foster Avenue Clinic; and (ii) no one explained to PE how to use the Fraudulent Equipment.

(v)   On October 15, 2018, an Insured named GF was purportedly injured in a motor vehicle accident. Thereafter, GF received treatment at the Foster Avenue Clinic. During an interview with a GEICO investigator, GF confirmed that: (i) GF received Fraudulent Equipment from a receptionist at Foster Avenue Clinic; and (ii) no one explained to GF how to use the Fraudulent Equipment.

86.   These are only representative examples. In virtually all the claims for Fraudulent Equipment identified in Exhibit "1", to the extent that the Insureds were actually provided with Fraudulent Equipment, the Insureds received the Fraudulent Equipment directly from the Clinics without any involvement from the Supplier Defendants.

87.   Upon information and belief, the Referral Defendants were knowingly involved in the Supplier Defendants unlawful financial arrangement schemes – either directly or through third-parties who are presently unidentifiable – by: (i) issuing prescriptions for Fraudulent Equipment as part of a predetermined protocol that they knew would be submitted to and billed by the Supplier Defendants as part of a scheme to defraud GEICO; or (ii) knowingly providing their license for others to issue prescriptions for Fraudulent Equipment that they knew would be billed by the Supplier Defendants as part of a scheme to defraud GEICO.

88.   In keeping with the fact that the Referral Defendants were knowingly involved in the Supplier Defendants unlawful financial arrangement schemes, a frequent amount of the prescriptions for Fraudulent Equipment that were purportedly provided to the Supplier Defendants

contained healthcare providers' signatures that were either photocopied or were signed by the use of a signature stamp, including from Keum, Mathew and Evans.

89.     Upon information and belief, Keum, Mathew and Evans knowingly provided their signatures to be photocopied and these photocopies given to laypersons that would unlawfully issue prescriptions for Fraudulent Equipment that were directly provided to the Supplier Defendants.

90.     Additionally, upon information and belief, Evans knowingly provided her signature stamp to laypersons that would unlawfully issue prescriptions for Fraudulent Equipment that were directly provided to the Supplier Defendants.

91.     In all of the claims identified in Exhibits "1", the Supplier Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

**C.     The Defendants' Fraudulent Prescription-Issuing Protocol**

92.     In addition to the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, the prescriptions provided to the Supplier Defendants were issued pursuant to predetermined fraudulent protocols that were designed to maximize the billing that the Supplier Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

93.     In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

94.     Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referral Defendants and other healthcare providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

95.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

96.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

97.     However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the healthcare providers that referred patients to the Supplier Defendants – including the Referral Defendants – were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

98.     The Referral Defendants and other healthcare providers issued prescriptions for Fraudulent Equipment to Insureds pursuant to predetermined fraudulent protocols without regard for the Insureds' individual symptoms or presentation.

99.     No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

100.    The healthcare providers, including the Referral Defendants, permitted the predetermined fraudulent protocols described below, which were not medically necessary, to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other New York automobile insurers.

101.    Overall, the predetermined fraudulent protocols executed by the healthcare providers that purportedly treated Insureds, including the Referral Defendants, had a similar pattern for an overwhelming majority of the Insureds associated with the claims identified in Exhibit "1", and was typically as follows:

- the Insured would arrive at a multi-disciplinary medical office for treatment subsequent to a motor vehicle accident;

- the Insured would be seen either by a physician, chiropractor, physician's assistant, or nurse practitioner;

- on the date of the first visit, the healthcare provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a predetermined set of DME and/or OD;

- subsequently, the Insured would return to the multi-disciplinary medical office for one or more additional evaluations and would be provided with an additional, and occasionally more than one, prescription for a predetermined set of DME and/or OD;

- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Supplier Defendants to fill and was without any involvement by the Insured.

102.    An overwhelming majority of the claims identified in Exhibit "1" are based upon medically unnecessary prescriptions for virtually identical Fraudulent Equipment, which were provided to the Supplier Defendants from various healthcare providers that practiced at multi-disciplinary medical offices across the New York metropolitan area.

103.    In keeping with the fact that the prescriptions provided to the Supplier Defendants were – not based on medical necessity but – part of a predetermined fraudulent protocol, an

overwhelming majority of the Insureds identified in Exhibit "1" that were prescribed Fraudulent Equipment after purportedly undergoing initial examinations were issued prescriptions for virtually identical Fraudulent Equipment, depending on which respective Clinic purportedly treated the Insureds, as detailed more specifically below.

104.    In keeping with the fact that the prescriptions were provided – not based on medical necessity but – as part of a predetermined fraudulent protocol, the prescriptions received by the Supplier Defendants after Insureds' purported initial examinations at the Foster Avenue, Utica Avenue and Kenilworth Place Clinics typically included the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) an eggcrate mattress; (iii) a lumbar support belt; (iv) a lumbar cushion; and (v) either a cervical pillow (Metro Pain Clinics) or a whirlpool (Kenilworth Place Clinic). These "initial examination prescriptions" were virtually identical regardless which healthcare provider, including the Referral Defendants, issued the prescription.

105.    Frequently, in addition to the typical "initial examination prescription", and as part of the predetermined fraudulent protocol at the Foster Avenue, Utica Avenue and Kenilworth Place Clinics, healthcare providers, including the Referral Defendants, would prescribe additional Fraudulent Equipment of virtually the same type, such as: (i) a bed board; (ii) a knee orthotic; (iii) a shoulder or elbow support; and (iv) an "orthopedic car seat", i.e. a cushion to use while inside a vehicle.

106.    Similarly, and keeping with the fact that the prescriptions were provided to the Supplier Defendants – not based on medical necessity but – as part of a predetermined fraudulent protocol, an overwhelming majority of the Insureds identified in Exhibit "1" were prescribed virtually identical Fraudulent Equipment after purportedly undergoing follow-up examinations at

the Foster Avenue, Utica Avenue and Kenilworth Place Clinics, regardless which healthcare provider purportedly treated the Insureds.

107.     In keeping with the fact that the prescriptions were provided – not based on medical necessity but – as part of a predetermined fraudulent protocol, the prescriptions received by the Supplier Defendants after Insureds' purported follow-up examinations at the Foster Avenue, Utica Avenue and Kenilworth Place Clinics typically included the following Fraudulent Equipment: (i) a TENS unit; (ii) a heat lamp; and (iii) a massager. These "follow-up examination prescriptions" were virtually identical regardless which healthcare provider, including the Referral Defendants, issued the prescription.

108.     Frequently, in addition to the typical "follow-up examination prescription", and as part of a predetermined fraudulent protocol, healthcare providers, including the Referral Defendants, would also prescribe one or more of the following Fraudulent Equipment: (i) a TENS belt, (ii) a whirlpool; or (iii) a water circulating heat pad with pump.

109.     Furthermore, and in keeping with the fact that the prescriptions were provided – not based on medical necessity but – as part of a predetermined fraudulent protocol, the prescriptions received by the Supplier Defendants after Insureds' continue treating at the at the Foster Avenue, Utica Avenue and Kenilworth Place Clinics and received additional purported follow-up examinations typically received at least one of the following Fraudulent Equipment: (i) a LSO APL (custom fitted); (ii) a cervical posture pump; or (iii) a knee orthosis custom fitted . These "additional follow-up examination prescriptions" were virtually identical regardless which healthcare provider, including the Referral Defendants, issued the prescription.

110.     In further keeping with the fact that the prescriptions provided to the Supplier Defendants were – not based on medical necessity but – part of a predetermined fraudulent

protocol, an overwhelming majority of the Insureds identified in Exhibit "1" who treated at the Foster Avenue, Utica Avenue and Kenilworth Place Clinics would receive the typical "initial examination prescription", the typical "follow-up examination prescription", and/or the typical "additional follow-up examination prescription" regardless which healthcare provider issued the prescription.

111.   Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – the prescriptions issued by the Referral Defendants and the other healthcare providers were never given to the Insureds but were routed directly to the Supplier Defendants.

112.   Upon information and belief, in an overwhelming majority of cases, to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from receptionists at the healthcare providers' offices, without any interaction from the Supplier Defendants.

113.   In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

114.   Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

115.   In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific

DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

116.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

117.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

118.    It is extremely improbable – to the point of impossibility – that an overwhelming majority of the Insureds identified in Exhibit "1" – who treated with one of many healthcare providers, including the Referral Defendants, at different Clinics around the New York metropolitan area – would ultimately receive near identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

119.    A substantial number of Insureds receiving virtually identical prescriptions for multiple items of Fraudulent Equipment would, by extension, mean that all those Insureds – who reported to one of many healthcare providers across the New York metropolitan area – complained of identical symptoms and exhibited identical weaknesses in their physical conditions.

120.    In actuality, the Insureds identified in Exhibit "1" who were provided with preset prescriptions of Fraudulent Equipment were provided with a specific preset prescription based

solely upon whether the Insured visited the prescribing healthcare provider for an initial examination or a follow-up examination.

121.    It is also improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

122.    It is extremely improbable that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology but would need virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

123.    It is extremely improbable – to the point of impossibility – that this legitimately would occur over and over again, with two or more Insureds who were involved in the same accident repeatedly being prescribed virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

124.    If two or more Insureds who were involved in the same underlying motor vehicle accident received virtually identical prescriptions for Fraudulent Equipment then, by extension, all of the Insureds who were involved in the same underlying motor vehicle accident had virtually identical complaints and virtually identical symptoms.

125.    In keeping with the fact that the Referral Defendants and other healthcare providers prescribed predetermined sets of Fraudulent Equipment that were purportedly provided by the Supplier Defendants pursuant to fraudulent protocols – and not based upon medical necessity – in virtually all cases when two or more Insureds were involved in the same accident the healthcare provider issued virtually identical prescriptions for Fraudulent Equipment.

126.    In further keeping with the fact that Fraudulent Equipment were prescribed pursuant to predetermined fraudulent protocols – and not based upon medical necessity – the specific Fraudulent Equipment contained on the prescriptions usually contravened the Insureds' conservative treatment plans.

127.    For example, and as indicated below, virtually every Insured identified in Exhibit "1" were provided with at least one prescription for Fraudulent Equipment that called for immobilizing devices, such as a LSO or a cervical collar. By contrast, the Insureds were also prescribed physical therapy treatments which called for the bending and stretching to strengthen weakened parts of the body.

128.    In soft tissue injuries, the type of which was exhibited by the Insureds identified in Exhibit "1", the purportedly prescribed immobilizing devices completely contravened the mobilizing physical therapy treatments that the Insureds were also prescribed. In the context of treatment for injuries related to minor and low-impact motor vehicle accidents, no legitimate physician, chiropractor, or other licensed healthcare provider acting in each patient's best interest would prescribe both mobilizing physical therapy and immobilizing devices at the same time.

129.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the prescriptions were purposefully generic and vague so as to allow the Supplier Defendants to choose the specific type of Fraudulent Equipment that they billed GEICO and other New York automobile insurers, in order to increase their financial gain.

### 1)    The Predetermined Fraudulent Protocol at the Metro Pain Clinics

130.    The healthcare providers at the Metro Pain Clinics, including Keum and Pak, either directly or with the assistance of third-party individuals not presently known, agreed to participate

in a predetermined fraudulent protocol and unlawful financial arrangement with the Supplier Defendants where they provided the Insureds that treated at the Metro Pain Clinics with prescriptions for a predetermined set of Fraudulent Equipment.

131.    Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Metro Pain Clinics were purportedly provided with initial examinations from a healthcare provider, including Keum and Pak. Subsequent to their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

132.    When the Insureds sought treatment with and were purportedly provided with an initial evaluation by a healthcare provider at the Metro Pain Clinics, including Keum and Pak, the healthcare providers did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

133.    Rather, healthcare providers at the Metro Pain Clinics, including Keum and Pak, prescribed a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon the fraudulent protocol established with the Supplier Defendants.

134.    In keeping with the fact that the prescriptions issued by healthcare providers at the Metro Pain Clinics, including Keum and Pak, subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination at the Metro Pain Clinics, including examinations by Keum and Pak, received a prescription for virtually the same type of Fraudulent Equipment.

135.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would

actually use the Fraudulent Equipment, after a purported initial examination healthcare providers at the Metro Pain Clinics, including Keum and Pak, virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) a two piece cervical collar; (ii) a cervical pillow; (iii) an egg crate mattress; (iv) a lumbar cushion; and (v) a lumbar support belt.

136.    In addition to the five items virtually always prescribed after a purported initial examination, Keum and Pak would frequently prescribe Insureds with: (i) an orthopedic car seat; (ii) a water circulating heat pad with pump, and/or (iii) a knee or elbow support after a purported initial examination.

137.    For example:

(i)     On September 5, 2018, an Insured named EJ was purportedly involved in a motor vehicle accident. EJ purportedly started treating at the Foster Avenue Clinic on or around September 7, 2018. After Keum purportedly performed an initial examination on EJ, Keum issued a prescription in the name of EJ that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) an orthopedic car seat; and (viii) shoulder support.

(ii)    On December 16, 2018, an Insured named JF was purportedly involved in a motor vehicle accident. JF purportedly started treating at the Utica Avenue Clinic on or around December 20, 2018. After Keum purportedly performed an initial examination on JF, Keum issued a prescription in the name of JF that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) knee support; and (viii) bed board.

(iii)   On January 29, 2019, an Insured named FR was purportedly involved in a motor vehicle accident. FR purportedly started treating at the Foster Avenue Clinic on or around February 6, 2019. After Pak purportedly performed an initial examination on FR, Pak issued a prescription in the name of FR that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) knee support; and (viii) shoulder support.

(iv)   On March 1, 2019, an Insured named RB was purportedly involved in a motor vehicle accident. RB purportedly started treating at the Foster Avenue Clinic on or around March 6, 2019. After Keum purportedly performed an initial examination on RB, Keum issued a prescription in the name of RB that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; and (vii) knee support.

(v)   On March 30, 2019, an Insured named LB was purportedly involved in a motor vehicle accident. LB purportedly started treating at the Utica Avenue Clinic on or around April 9, 2019. After Keum purportedly performed an initial examination on LB, Keum issued a prescription in the name of LB that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) a bed board; and (viii) knee support.

(vi)   On April 17, 2019, an Insured named RS was purportedly involved in a motor vehicle accident. RS purportedly started treating at the Utica Avenue Clinic on or around April 25, 2019. After Pak purportedly performed an initial examination on RS, Pak issued a prescription in the name of RS that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) bed board; (viii) orthopedic position seat; and (ix) shoulder support.

(vii)   On May 22, 2019, an Insured named KH was purportedly involved in a motor vehicle accident. KH purportedly started treating at the Utica Avenue Clinic on or around May 23, 2019. After Pak purportedly performed an initial examination on KH, Pak issued a prescription in the name of KH that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) knee support; and (viii) bed board.

(viii)   On May 24, 2019, an Insured named JS was purportedly involved in a motor vehicle accident. JS purportedly started treating at the Utica Avenue Clinic on or around June 4, 2019. After Pak purportedly performed an initial examination on JS, Pak issued a prescription in the name of JS that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) bed board; and (viii) shoulder support.

(ix)   On June 18, 2019, an Insured named PW was purportedly involved in a motor vehicle accident. PW purportedly started treating at the Foster Avenue Clinic on or

around June 24, 2019. After Keum purportedly performed an initial examination on PW, Keum issued a prescription in the name of PW that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; (vi) water circulating heat pad with pump; (vii) elbow orthosis; (viii) knee support; and (ix) shoulder orthosis.

(x)     On July 5, 2019, an Insured named DS was purportedly involved in a motor vehicle accident. DS purportedly started treating at the Utica Avenue Clinic on or around July 11, 2019. After Pak purportedly performed an initial examination on DS, Pak issued a prescription in the name of DS that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) cervical pillow; (iii) egg crate mattress; (iv) lumbar cushion; (v) lumbar support belt; and (vi) water circulating heat pad with pump.

138.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that underwent initial examinations by healthcare providers at the Metro Pain Clinics, including examination by Keum or Pak, were provided with virtually identical prescripts for Fraudulent Equipment.

139.    In a legitimate setting, when a patient is prescribed DME and/or OD by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME and/or OD was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

140.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided after purported initial examinations at the Metro Pain Clinics were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous initial examination reports written by healthcare providers, including Keum or Pak, did not contain any sufficient information to explain why the healthcare provider prescribed any of the Fraudulent Equipment.

141.    For example, the checklist and fill-in the blank evaluation reports utilized by healthcare providers at the Metro Pain Clinics, including Keum and Pak, contained a section for Medical Supplies with items listed in a checklist.   These evaluation reports were purportedly written on the same date as the prescription for Fraudulent Equipment, but in many cases did not identify any of the Fraudulent Equipment that was prescribed. Even more, the evaluation reports virtually never contained any specific detail explaining why the Fraudulent Equipment was prescribed.

142.    The predetermined fraudulent protocol between the Supplier Defendants and the healthcare providers at the Metro Pain Clinics, including Keum and Pak, continued after the Insureds' initial examinations. To the extent that the Insureds identified in Exhibit "1" returned to the Metro Pain Clinics, the Insureds would virtually always be provided with prescriptions for another – virtually identical – set of Fraudulent Equipment.

143.    In keeping with the fact that the prescriptions provided to the Insureds as the Insureds purportedly continued treating at the Metro Pain Clinics were medically unnecessary and provided pursuant to a predetermined fraudulent protocol with the Supplier Defendants, virtually every Insured received at least one prescription for virtually the same type of Fraudulent Equipment regardless which healthcare provider issued the prescription.

144.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, healthcare providers at the Metro Pain Clinics, including Keum and Pak, virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that continued treating

at the Metro Pain Clinics: (i) a massager; (ii) infrared heat lamp; (iii) TENS unit: and (iv) TENS belt.

145.   Even more, to the extent that the Insureds identified in Exhibit "1" continued treating at the Metro Pain Clinics, the Insureds would virtually always be provided with prescriptions for additional Fraudulent Equipment.

146.   Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, as the Insureds identified in Exhibit "1" continued treating at the Metro Pain Clinic, healthcare providers including Keum and Pak, virtually always prescribed at least one of following Fraudulent Equipment: (i) LSO APL (custom fitted) and/or (ii) cervical posture pump.

147.   To the extent that Insureds were prescribed both a LSO APL (custom fitted) and a cervical posture pump, healthcare providers, including Keum and Pak, would issue two separate prescriptions on a single date that would be provided to the Supplier Defendants.

148.   Upon information and belief, healthcare providers at the Metro Pain Clinics, including Keum and Pak, virtually always issued multiple separate prescriptions on a single date for an individual Insured in order to provide the Supplier Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to avoid detection of their fraudulent schemes.

149.   In keeping with the fact that the healthcare providers at the Metro Pain Clinics, including Keum and Pak, issued multiple prescriptions to Insureds on a single date to further their fraudulent scheme, the multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription. Even more, both prescriptions were issued using the same

checkmark-based prescription-form that identified both items yet two prescriptions were issued instead of one.

150.    There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date that was filled by a single DME/OD retailer, including the Supplier Defendants. Even more, there is no legitimate reason why this would occur in a substantial amount of the Insureds identified in Exhibit "1" who treated at the Metro Pain Clinics.

151.    Keum, Pak, and other providers at the Metro Pain Clinics, frequently issued at least two, and oftentimes three separate prescriptions for DME and/or OD to an Insured on the same date for no legitimate purpose. For example:

(i)      On December 27, 2018, an Insured named HM was purportedly involved in a motor vehicle accident. HM purportedly started treating with Metro Pain at the Utica Avenue Clinic on January 3, 2019. On February 12, 2019, the same day that Keum purportedly conducted a follow-up examination, Keum issued the following three prescriptions in the name of HM that were provided to the Supplier Defendants: (i) a prescription for a massager, infrared heating lamp, TENS unit, and TENS belt; (ii) a prescription for a LSO APL (custom fitted); and (iii) a prescription for a cervical posture pump.

(ii)     On December 29, 2018, an Insured named SD was purportedly involved in a motor vehicle accident. SD purportedly started treating with Metro Pain at the Foster Avenue Clinic on January 9, 2019. On February 27, 2019, the same day that Keum purportedly conducted a follow-up examination, Keum issued the following prescription in the name of SD that was provided to the Supplier Defendants: (i) a massager; (ii)  infrared heating lamp; (iii) TENS unit; (iv) TENS belt; and (v) a whirlpool.  On February 12, 2019, Keum issued a prescription in the name of SD for a cervical posture pump despite Keum not performing a follow-up examination or any other service on SD on that day.

(iii)    On December 31, 2018, an Insured named JE was purportedly involved in a motor vehicle accident. JE purportedly started treating with Metro Pain at the Foster Avenue Clinic on January 2, 2019. On February 6, 2019, the same day that Pak purportedly conducted a follow-up examination, Pak issued the following prescription in the name of JE that was provided to the Supplier Defendants: (i) a massager; (ii)  infrared heating lamp; (iii) TENS unit; (iv) TENS belt; and (v) a whirlpool.  On February 12, 2019, Keum issued a prescription in the name of JE

for a LSO APL (custom fitted) that was provided to the Supplier Defendants despite Pak not performing a follow-up examination or any other service on JE on that day.

(iv)    On January 21, 2019, an Insured named CM was purportedly involved in a motor vehicle accident. CM purportedly started treating with Metro Pain at the Utica Avenue Clinic on February 21, 2019.  On March 21, 2019, the same date that Keum purportedly conducted a follow-up examination, Keum issued a prescription in the name of CM that was provided to the Supplier Defendants for (i) a massager; (ii) infrared heating lamp; (iii) TENS unit; and (iv) TENS belt.  On April 2, 2019, Keum issued two separate prescriptions in the name of CM for (i) LSO APL (custom fitted); and (ii) cervical posture pump that were provided to the Supplier Defendants despite Keum not performing a follow-up examination or any other service on CM on that day.

(v)    On March 1, 2019, an Insured named JL was purportedly involved in a motor vehicle accident. JL purportedly started treating with Metro Pain at the Utica Avenue Clinic on February 21, 2019.  On April 25, 2019, the same date that Pak purportedly conducted a follow-up examination, Pak issued a prescription in the name of JL that was provided to the Supplier Defendants for (i) a massager; (ii) infrared heating lamp; (iii) TENS unit; and (iv) TENS belt.  On April 30, 2019, Keum issued three separate prescriptions in the name of JL for (i) LSO APL (custom fitted); (ii) cervical posture pump; and (iii) knee orthotic (custom fitted) that were provided to the Supplier Defendants despite Keum not performing a follow-up examination or any other service on JL on that day.

(vi)    On April 2, 2019, an Insured named WG was purportedly involved in a motor vehicle accident. WG purportedly started treating with Metro Pain at the Utica Avenue Clinic on April 4, 2019.  On May 2, 2019, the same date that Pak purportedly conducted a follow-up examination, Pak issued a prescription in the name of WG that was provided to the Supplier Defendants for (i) a massager; (ii) infrared heating lamp; (iii) TENS unit; and (iv) TENS belt.  On April 30, 2019, Keum issued a prescription in the name of WG for a LSO APL (custom fitted) that was provided to the Supplier Defendants despite Keum not performing a follow-up examination or any other service on WG on that day.

(vii)    On April 10, 2019, an Insured named JS was purportedly involved in a motor vehicle accident. JS purportedly started treating with Metro Pain at the Utica Avenue Clinic on April 16, 2019. On May 14, 2019, the same day that Keum purportedly conducted a follow-up examination, Keum issued the following prescription in the name of JS that was provided to the Supplier Defendants: (i) a massager; (ii)  infrared heating lamp; (iii) TENS unit; and (iv) TENS belt.  On May 9, 2019, Pak issued two prescriptions in the name JS for (i) cervical posture pump; and (ii) knee orthosis (custom fitted) despite Pak not performing a follow-up examination or any other service on JS on that day.

(viii)   On April 29, 2019, an Insured named EL was purportedly involved in a motor vehicle accident. EL purportedly started treating with Metro Pain at the Utica Avenue Clinic on May 14, 2019. On June 18, 2019, the same date that Pak purportedly conducted a follow-up examination, Pak issued a prescription in the name of EL that was provided to the Supplier Defendants for (i) a massager; (ii) infrared heating lamp; (iii) TENS unit; and (iv) TENS belt. On June 13, 2019, Pak issued three separate prescriptions in the name of AC for (i) LSO APL (custom fitted); (ii) cervical posture pump; and (iii) knee orthosis (custom fitted) that were provided to the Supplier Defendants despite Pak not performing a follow-up examination or any other service on EL on that day.

(ix)   On May 8, 2019, an Insured named AC was purportedly involved in a motor vehicle accident. AC purportedly started treating with Metro Pain at the Utica Avenue Clinic on May 16, 2019. On June 18, 2019, the same date that Pak purportedly conducted a follow-up examination, Pak issued a prescription in the name of AC that was provided to the Supplier Defendants for (i) a massager; (ii) infrared heating lamp; (iii) TENS unit; and (iv) TENS belt. On June 13, 2019, Pak issued two separate prescriptions in the name of AC for (i) LSO APL (custom fitted); and (ii) cervical posture pump that were provided to the Supplier Defendants despite Pak not performing a follow-up examination or any other service on AC on that day.

(x)   On June 2, 2019, an Insured named AB was purportedly involved in a motor vehicle accident. AB purportedly started treating with Metro Pain at the Utica Avenue Clinic on June 4, 2019. On July 16, 2019, the same date that Pak purportedly conducted a follow-up examination, Pak issued a prescription in the name of AB that was provided to the Supplier Defendants for (i) a massager; (ii) infrared heating lamp; (iii) TENS unit; and (iv) TENS belt. On July 8, 2019, Pak issued two prescriptions in the name of AB for (i) LSO APL (custom fitted); and (ii) cervical posture pump that were provided to the Supplier Defendants despite Pak not performing a follow-up examination or any other service on AB on that day.

152.   These are only representative samples. In fact, a frequent amount of the Insureds identified in Exhibit "1" received multiple prescriptions for DME and/or OD on the same date that were provided to the Supplier Defendants.

153.   In further keeping with the fact that the prescriptions were provided to the Insureds identified in Exhibit "1" were for medically unnecessary Fraudulent Equipment that were provided pursuant to a predetermined fraudulent protocol, a significant number of prescriptions were purportedly issued by healthcare providers at Metro Pain, including Keum or Pak, on dates when that healthcare provider did not provide a follow-up examination or other healthcare service.

154.    Similar to the prescriptions issued contemporaneously with the purported initial examination, and in keeping with the fact that the prescriptions provided after the initial examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports did not contain any sufficient information to explain why the healthcare providers prescribed any of the Fraudulent Equipment.

155.    Furthermore, and in keeping with the fact that the prescriptions provided after the initial examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

156.    Even more, and in keeping with the fact that the prescriptions provided after the initial examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were written to the Insureds identified in Exhibit "1" on dates that the healthcare providers at the Metro Pain Clinics, including Keum and Pak, did not conduct a follow-up examination or other healthcare service, the subsequent follow-up examination reports never referenced, discussed, or explained the recently previously prescribed Fraudulent Equipment.

157.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a

further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

158.    However, the follow-up examination reports from healthcare providers at the Metro Pain Clinics failed to include any meaningful information regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

159.    In keeping with the fact that all the prescriptions issued to the Insureds identified in Exhibit "1" by the healthcare providers at the Metro Pain Clinics, including Keum and Pak, were not medically necessary and were part of a predetermined fraudulent protocol, when two or more Insureds were involved in the same underlying motor vehicle accident and received treatment at the Metro Pain Clinics, those Insureds virtually always received the above-described virtually identical prescriptions for Fraudulent Equipment.

160.    For example:

(i)      On January 17, 2019, two Insureds – DW and EW – were involved in the same automobile accident. Thereafter, DW and EW both received treatment at the Foster Avenue Clinic.  DW and EW were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of DW and EW on January 30, 2019 – Keum issued virtually identical prescriptions for Fraudulent Equipment to DW and EW that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; and (vi) a water circulating heat pad with pump. Furthermore, on February 27, 2019, Keum issued two prescriptions in the name of DW for (i) a cervical posture pump; and (ii) a LSO APL (custom fitted) that were provided to the Supplier Defendants, despite Keum not performing a follow-up examination or any other service on DW that day. During follow-up examinations of DW and EW on March 6, 2019, Keum issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a TENS unit; (ii) a TENS belt; (iii) an infrared heating lamp; (iv) a massager; and (v) a whirlpool.  On March 20, 2019, Keum issued two prescriptions in the name of EW for (i) a cervical posture pump; and (ii) a LSO APL (custom fitted) that were provided to the Supplier Defendants, despite Keum not performing a follow-up examination or any other service on EW that day.

(ii)     On January 28, 2019, two Insureds – PL and ST – were involved in the same automobile accident. Thereafter, PL and ST both received treatment at the Utica Avenue Clinic. PL and ST were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of PL and ST on January 29, 2019 – Keum issued virtually identical prescriptions for Fraudulent Equipment to PL and ST that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; and (vi) a water circulating heat pad with pump. During follow-up examinations for PL and ST on March 7, 2019, Keum issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a TENS unit; (ii) a TENS belt; (iii) an infrared heating lamp; and (iv) a massager.  Furthermore, on March 7, 2019, Keum issued two prescriptions in the name of ST for (i) a cervical posture pump; and (ii) a LSO APL (custom fitted) that were provided to the Supplier Defendants. On April 2, 2019, Keum issued two prescriptions in the name of PL for (i) a cervical posture pump; and (ii) a LSO APL (custom fitted) that were provided to the Supplier Defendants, despite Keum not performing a follow-up examination or any other service on PL that day.

(iii)    On March 23, 2019, two Insureds – DM and GM – were involved in the same automobile accident. Thereafter, DM and GM both received treatment at the Utica Avenue Clinic. DM and GM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of DM and GM on March 26, 2019 – Keum issued virtually identical prescriptions for Fraudulent Equipment to DM and GM that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; and (vi) a water circulating heat pad with pump. During follow-up examinations for DM and GM on April 26, 2019, Pak issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a TENS unit; (ii) a TENS belt; (iii) an infrared heating lamp; and (iv) a massager.  Furthermore, on April 30, 2019, Keum issued two prescriptions each in the names of DM and GM for (i) a cervical posture pump; and (ii) a LSO APL (custom fitted) that were provided to the Supplier Defendants, despite Keum not performing a follow-up examination or any other service on DM and GM that day.

(iv)    On April 10, 2019, two Insureds – MS and RV – were involved in the same automobile accident. Thereafter, MS and RV both received treatment at the Utica Avenue Clinic. MS and RV were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of MS and RV on April 16, 2019 – Keum issued similar prescriptions for Fraudulent Equipment to MS and RV that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a

cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; (vi) a water circulating heat pad with pump; and (vii) a bed board.

(v)     On April 11, 2019, two Insureds – ES and GS – were involved in the same automobile accident. Thereafter, ES and GS both received treatment at the Foster Avenue Clinic. ES and GS were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of ES and GS on April 17, 2019 – Keum issued virtually identical prescriptions for Fraudulent Equipment to ES and GS that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; and (vi) a water circulating heat pad with pump. Furthermore, on May 31, 2019, Keum issued two prescriptions in the name of ES for (i) a cervical posture pump, and (ii) a LSO APL (custom fitted), and one prescription in the name of GS for LSO APL (custom fitted) that were provided to the Supplier Defendants, despite Keum not performing a follow-up examination or any other service on ES and GS that day. During follow-up examinations for ES on June 12, 2019, and GS on June 5, 2019, Keum issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a TENS unit; (ii) a TENS belt; (iii) an infrared heating lamp; (iv) a massager; and (v) a whirlpool.

(vi)    On April 25, 2019, three Insureds – FS, GS, and JR – were involved in the same automobile accident. Thereafter, FS, GS, and JR all received treatment at the Foster Avenue Clinic.  FS, GS, and JR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of GS on April 26, 2019 by Pak, and FS and JR on May 1, 2019 by Keum, both providers issued virtually identical prescriptions for Fraudulent Equipment to FS, GS, and JR that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; and (vi) a water circulating heat pad with pump.

(vii)   On April 28, 2019, four Insureds – AA, EM, ID, and JD – were involved in the same automobile accident. Thereafter, AA, EM, and ID all received treatment at the Utica Avenue Clinic, and JD received treatment at the Foster Avenue Clinic.  AA, EM, ID, and JD were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations by Keum of AA and EM on April 30, 2019 and JD on May 10, 2019, and by Pak of Isiah Dalton on May 7, 2019, both providers issued virtually identical prescriptions for Fraudulent Equipment to AA, EM, ID, and JD that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; and (vi) a water circulating heat pad with pump.

(viii)   On May 16, 2019, two Insureds – JO and LO – were involved in the same automobile accident. Thereafter, JO and LO both received treatment at the Utica Avenue Clinic. JO and LO were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of JO and LO on May 21, 2019 – Keum issued virtually identical prescriptions for Fraudulent Equipment to JO and LO that were provided to the Supplier Defendants, which included: (i) a lumbar support brace; (ii) a lumbar cushion; (iii) an eggcrate mattress; and (iv) a water circulating heat pad with pump. During follow-up examinations for JO and LO on July 16, 2019, Pak issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a TENS unit; (ii) a TENS belt; (iii) an infrared heating lamp; and (iv) a massager.

(ix)   On May 22, 2019, two Insureds – DH and SS – were involved in the same automobile accident. Thereafter, DH and SS both received treatment at the Utica Avenue Clinic. DH and SS were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations by Pak of DH and SS on May 23, 2019, Pak issued virtually identical prescriptions for Fraudulent Equipment to DH and SS that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; (vi) a water circulating heat pad with pump; (vii) a bed board; and (viii) a shoulder support.

(x)   On June 22, 2019, three Insureds – DS, TS, and LK – were involved in the same automobile accident. Thereafter, DS, TS, and LK all received treatment at the Utica Avenue Clinic. DS, TS, and LK were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to the purported initial examinations of DS, TS, and LK on July 2, 2019 – Pak issued nearly identical prescriptions for Fraudulent Equipment to DS and TS that were provided to the Supplier Defendants, which included: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a lumbar support brace; (iv) a lumbar cushion; (v) an eggcrate mattress; (vi) a water circulating heat pad with pump; (vii) a bed board; and (viii) a shoulder support.   Furthermore, on July 23, 2019, Pak issued two prescriptions each in the names of DS and TS, and on August 6, 2019, Pak issued two prescriptions in the name of LK for (i) a cervical posture pump, and (ii) a LSO APL (custom fitted) that were provided to the Supplier Defendants, despite Pak not performing a follow-up examination or any other service DS, TS, and LK on those dates. During follow-up examinations for TS and LK on August 15, 2019 and DS on August 22, 2019, Pak issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a TENS unit; (ii) a TENS belt; (iii) an infrared heating lamp; (iv) a massager; and (v) a whirlpool.

161.    These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" where two or more Insureds were involved in the same underlying accident and received treatment at the Metro Pain Clinics, the healthcare providers at the Metro Pain Clinics, including Keum and Pak, virtually always prescribed multiple prescriptions for virtually identical Fraudulent Equipment despite the fact that the Insureds were differently situated.

162.    In addition to the above, and in keeping with the fact that each prescription for Fraudulent Equipment issued from a healthcare provider at the Metro Pain Clinics were pursuant to a predetermined fraudulent protocol as a result of an unlawful financial arrangement with the Supplier Defendants, it is notable that: (i) virtually all of the prescriptions issued to the Insureds who treated at the Metro Pain Clinics with Keum and Pak were for the Fraudulent Equipment identified as part of the pattern above; and (ii) in many circumstances GEICO received prescriptions for Fraudulent Equipment with a specific date when GEICO did not receive a bill for services provided by the prescribing healthcare provider on or around the date of the prescription.

163.    In further keeping with the fact that each prescription for Fraudulent Equipment issued from a healthcare provider at the Metro Pain Clinics were not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical collars and lumbar support braces routinely contravened the Insureds' conservative treatment plans.  For example, Keum and Pak systemically prescribed cervical collars and lumbar support braces which immobilize the patient while directing the Insureds to undergo physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine. In this context, the prescriptions for cervical collars and lumbar support braces completely contravened the mobilizing physical therapy treatments also prescribed by the same healthcare

provider. No legitimate treatment regimen would involve the simultaneous prescription of mobilizing physical therapy and immobilizing devices.

164.    Additionally, as part of the fraudulent scheme, the prescriptions issued by the healthcare providers at the Metro Pain Clinics, including Keum and Pak, were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Metro Pain Clinics, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

165.    Also as part of the fraudulent scheme, the prescriptions issued by the healthcare providers at the Metro Pain Clinics, including Keum and Pak, were purposefully generic and vague so as to allow the Supplier Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

166.    By way of example, rather than specifying the type of lumbar orthotic devices that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – Keum and Pak simply issued prescriptions containing the phrase "lumbar support belt w/hot & cold therapy" with the intent of enabling the Supplier Defendants to select a specific type of lumbar brace that was more highly priced and profitable, instead of issuing prescriptions for lumbar braces that were actually needed in the first instance.

2) **The Predetermined Fraudulent Protocol at the Kenilworth Place Clinic**

167.     Similar to the scheme at the Metro Pain Clinics, healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, either directly or with the assistance of third-party individuals who are not presently known, agreed to participate in a predetermined fraudulent protocol and unlawful financial arrangement with the Supplier Defendants where they provided the Insureds that they treated at the Kenilworth Place Clinic with prescriptions for a predetermined set of Fraudulent Equipment.

168.     Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Kenilworth Place Clinic were purportedly provided with initial examinations. After the initial examinations from a healthcare provider, including Mathew and Evans, each of the Insureds were prescribed a preset prescription for multiple items of Fraudulent Equipment.

169.     When the Insureds sought treatment with and were purportedly provided with an initial examination by a healthcare provider at the Kenilworth Place Clinic, including Mathew and Evans, the healthcare providers did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

170.     Rather, healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, prescribed a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon the fraudulent protocol established with the Supplier Defendants.

171.     In keeping with the fact that the prescriptions issued by healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination at the

Kenilworth Place Clinic, including initial examinations by Mathew and Evans, received a prescription for virtually the same type of Fraudulent Equipment.

172.   Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination, healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) two-piece cervical collar; (ii) lumbar support belt; (iii) egg crate mattress; (iv) lumbar cushion; and (v) whirlpool.

173.   In addition to the five items described above, Mathew and Evans would regularly prescribe an orthopedic positioning seat, and occasionally prescribe a bed board.

174.   For example:

(i)   On July 21, 2018, an Insured named AB was purportedly involved in a motor vehicle accident. AB purportedly started treating at the Kenilworth Place Clinic with Evans on July 24, 2018. After Evans purportedly performed an initial examination on AB, Evans issued a prescription in the name of AB that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; and (vi) a bed board.

(ii)   On October 20, 2018, an Insured named JM was purportedly involved in a motor vehicle accident. JM purportedly started treating at the Kenilworth Place Clinic with Evans on October 31, 2018. After Evans purportedly performed an initial examination on JM, Evans issued a prescription in the name of JM that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; and (vi) a bed board.

(iii)   On January 18, 2019, an Insured named WP was purportedly involved in a motor vehicle accident. WP purportedly started treating at the Kenilworth Place Clinic with Evans on January 22, 2019. After Evans purportedly performed an initial examination on WP, Evans issued a prescription in the name of WP that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a

cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; and (vi) a bed board.

(iv)     On February 12, 2019, an Insured named TF was purportedly involved in a motor vehicle accident. TF purportedly started treating at the Kenilworth Place Clinic with Mathew on February 19, 2019. After Mathew purportedly performed an initial examination on TF, Mathew issued a prescription in the name of TF that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; and (vi) an orthopedic positioning seat.

(v)     On February 28, 2019, an Insured named NC was purportedly involved in a motor vehicle accident. NC purportedly started treating at the Kenilworth Place Clinic with Mathew on March 20, 2019. After Mathew purportedly performed an initial examination on NC, Mathew issued a prescription in the name of NC that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; and (v) a whirlpool.

(vi)     On March 4, 2019, an Insured named BP was purportedly involved in a motor vehicle accident. BP purportedly started treating at the Kenilworth Place Clinic with Mathew on March 5, 2019. After Mathew purportedly performed an initial examination on BP, Mathew issued a prescription in the name of BP that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; (vi) a bed board; and (vii) an orthopedic positing seat.

(vii)     On March 19, 2019, an Insured named DC was purportedly involved in a motor vehicle accident. DC purportedly started treating at the Kenilworth Place Clinic with Mathew on March 20, 2019. After Mathew purportedly performed an initial examination on DC, Mathew issued a prescription in the name of DC that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; and (vi) an orthopedic positioning seat.

(viii)     On April 9, 2019, an Insured named FA was purportedly involved in a motor vehicle accident. FA purportedly started treating at the Kenilworth Place Clinic with Mathew on April 15, 2019. After Mathew purportedly performed an initial examination on FA, Mathew issued a prescription in the name FA that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; (vi) an orthopedic positing seat; and (vii) a bed board.

(ix)      On May 8, 2019, an Insured named SB was purportedly involved in a motor vehicle accident. SB purportedly started treating at the Kenilworth Place Clinic with Evans on May 8, 2019. After Evans purportedly performed an initial examination on SB, Evans issued a prescription in the name of SB that was provided to the Supplier Defendants that included the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; (vi) a bed board; and (vii) an orthopedic positing seat.

(x)      On May 30, 2019, an Insured named LB was purportedly involved in a motor vehicle accident. LB purportedly started treating at the Kenilworth Place Clinic with Evans on June 3, 2019. After Evans purportedly performed an initial examination on LB, Evans issued a prescription in the name of LB that was provided to the Supplier Defendants for the following Fraudulent Equipment: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; (vi) a bed board; and (vii) an orthopedic positing seat.

175.      These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received an initial examination at the Kenilworth Place Clinic, including examinations by Mathew or Evans, were provided with prescriptions containing preset Fraudulent Equipment.

176.      In keeping with the fact that the prescriptions for Fraudulent Equipment provided after purported initial examinations at the Kenilworth Place Clinic, including examinations by Mathew or Evans, were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous initial examination reports did not contain any sufficient information to explain why the healthcare providers prescribed any of the Fraudulent Equipment.

177.      The predetermined fraudulent protocol between the Supplier Defendants and healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, continued after the Insureds' initial examinations. To the extent that the Insureds identified in Exhibit "1" continued obtaining treatment at the Kenilworth Place Clinic and purportedly underwent follow-up examinations, the Insureds would frequently be provided at least one, and oftentimes as many

as three additional prescriptions for virtually identical Fraudulent Equipment that were provided to the Supplier Defendants.

178.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, after a purported follow-up examination, providers at the Kenilworth Place Clinic including Mathew and Evans virtually always prescribed to every Insured identified in Exhibit "1" that they treated with at least one of three preset prescriptions for Fraudulent Equipment. One set of Fraudulent Equipment included: (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.  Additional sets of Fraudulent Equipment included one or more of the following: (i) a cervical posture pump; (ii) a LSO APL (custom fitted); and/or (iii) a knee orthosis (custom Fitted).

179.    When the Insureds identified in Exhibit "1" were prescribed Fraudulent Equipment after purported follow-up examinations at the Kenilworth Place Clinic, to the extent that Insureds were prescribed multiple pieces of DME, including a LSO APL (custom fitted), a cervical posture pump, and/or a knee orthosis (custom fitted), healthcare providers including Mathew and Evans would issue separate prescriptions for each of these items on a single date that would be provided to the Supplier Defendants.

180.    Upon information and belief, healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, virtually always issued multiple separate prescriptions on a single date for an individual Insured in order to provide the Supplier Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to avoid detection of their fraudulent schemes.

181.    In keeping with the fact that the healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, issued multiple prescriptions to Insureds on a single date to further their fraudulent scheme, the multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription. Even more, both prescriptions were issued using the same checkmark-based prescription-form that identified both items yet two prescriptions were issued instead of one.

182.    There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date that was filled by a single DME/OD retailer, including the Supplier Defendants. Even more, there is no legitimate reason why this would occur in a substantial amount of the Insureds identified in Exhibit "1" who treated at the Kenilworth Place Clinics.

183.    For example:

(i)     On August 7, 2018, an Insured named DW was purportedly involved in a motor vehicle accident. DW purportedly started treating on September 24, 2018. Following a purported follow-up examination on October 22, 2018, Evans issued a prescription in the name of DW for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager; and (iv) a water circulating heat pad with pump.

(ii)    On August 25, 2018, an Insured named DB was purportedly involved in a motor vehicle accident. DB purportedly started treating at the Kenilworth Place Clinic on August 29, 2018.  Following a purported follow-up examination with Evans on November 5, 2018, Evans issued a prescription in the name of DB that was provided to the Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager; and (iv) a water circulating heat pad with pump.

(iii)   On December 27, 2018, an Insured named KJ was purportedly involved in a motor vehicle accident. KJ purportedly started treating at the Kenilworth Place Clinic on January 15, 2019. Following a purported follow-up examination with Mathew on February 11, 2019, Mathew issued a prescription in the name of KJ that was provided to the Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.  On February 13, 2019, Mathew issued three separate prescriptions in the name of KJ for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i)

a LSO APL (custom fitted); (ii) a cervical posture pump; and (iii) a knee orthosis (custom fitted), despite Mathew not performing a  follow-up examination or any other service on KJ on that day.

(iv)     On January 23, 2019, an Insured named MF was purportedly involved in a motor vehicle accident. MF purportedly started treating on March 1, 2019. On May 9, 2019, Evans issued two separate prescriptions in the name of MF for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); and (ii) a cervical posture pump despite Evans not performing a follow-up examination or any other service on MF on that day.

(v)     On January 29, 2019, an Insured named PH was purportedly involved in a motor vehicle accident. PH purportedly started treating at the Kenilworth Place Clinic on January 31, 2019. Following a purported follow-up examination with Mathew on March  27, 2019, Mathew issued a prescription in the name of PH that was provided to the Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.

(vi)     On January 31, 2019, an Insured named OF was purportedly involved in a motor vehicle accident. OF purportedly started treating at the Kenilworth Place Clinic on February 25, 2019.  On March 13, 2019, Mathew issued three separate prescriptions in the name of OF for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); (ii) a cervical posture pump; and (iii) a knee orthosis (custom fitted), despite Mathew not performing a  follow-up examination or any other service on OF on that day.  Following a purported follow-up examination with Mathew on April 1, 2019, Mathew issued a prescription in the name of OF that was provided to the Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.

(vii)     On February 14, 2019, an Insured named PD was purportedly involved in a motor vehicle accident. PD purportedly started treating at the Kenilworth Place Clinic on February 19, 2019. Following a purported follow-up examination with Mathew on March 27, 2019, Mathew issued three separate prescriptions in the name of PD for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); (ii) a cervical posture pump; and (iii) a knee orthosis (custom fitted).  Following another purported follow-up examination with Ahuva Schachter, P.A. ("Schacter") on April 30, 2019, Schacter issued a prescription in the name of PD that was provided to the Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.

(viii)     On March 4, 2019, an Insured named BP was purportedly involved in a motor vehicle accident. BP purportedly started treating at the Kenilworth Place Clinic on March 5, 2019. Following a purported follow-up examination with Evans on April 16, 2019, Evans issued a prescription in the name of BP that was provided to the

Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager; and (iv) a water circulating heat pad with pump. On April 25, 2019, Mathew issued two separate prescriptions in the name of BP for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) LSO APL (Custom Fitted); and (ii) a cervical posture pump, despite Mathew not performing a follow-up examination or any other service on BP on that day.

(ix)     On March 18, 2019, an Insured named MA was purportedly involved in a motor vehicle accident. MA purportedly started treating at the Kenilworth Place Clinic on March 27, 2019.  On May 2, 2019, Mathew issued two separate prescriptions in the name of MA for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); and (ii) a cervical posture pump despite Mathew not performing a follow-up examination or any other service on MA on that day. Following a purported follow-up examination with Evans on May 8, 2019, Evans issued a prescription in the name of MA that was provided to the Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.

(x)     On April 27, 2019, an Insured named DH was purportedly involved in a motor vehicle accident. DH purportedly started treating at the Kenilworth Place Clinic on April 29, 2019.  Following a purported follow-up examination with Evans on May 29, 2019, Evans issued a prescription in the name of DH that was provided to the Suppler Defendants for (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.  On May 30, 2019, Evans issued two separate prescriptions in the name of DH for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); and (ii) a cervical posture pump despite Evans not performing a follow-up examination or any other service on DH on that day.

184.     These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received follow-up examinations at the Kenilworth Place Clinic were issued additional predetermined prescriptions for Fraudulent Equipment.

185.     In further keeping with the fact that the prescriptions were provided to the Insureds identified in Exhibit "1" were for medically unnecessary Fraudulent Equipment that were provided pursuant to a predetermined fraudulent protocol, a frequent number of prescriptions were purportedly issued by healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, on dates when that healthcare provider did not provide a follow-up examination or other healthcare service.

186.    Similar to the prescriptions issued contemporaneously with the purported initial examination, and in keeping with the fact that the prescriptions provided after the initial examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports did not contain any sufficient information to explain why the healthcare providers prescribed any of the Fraudulent Equipment.

187.    Furthermore, and in keeping with the fact that the prescriptions provided after the initial examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

188.    Even more, and in keeping with the fact that the prescriptions provided after the initial examinations were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were written to the Insureds identified in Exhibit "1" on dates that the healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, did not conduct a follow-up examination or other healthcare service, the subsequent follow-up examination reports never referenced, discussed, or explained the recently previously prescribed Fraudulent Equipment.

189.    In keeping with the fact that all the prescriptions issued to the Insureds identified in Exhibit "1" by the healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, were not medically necessary and were part of a predetermined fraudulent protocol, when two or more Insureds were involved in the same underlying motor vehicle accident and received

treatment at the Kenilworth Avenue Clinic, those Insureds virtually always received the above-described virtually identical prescriptions for Fraudulent Equipment.

190.   For example:

(i)   On May 25, 2018, three Insureds – MS, Sr., MS, Jr., and SS – were involved in the same automobile accident. Thereafter, MS, Sr., MS, Jr., and SS all sought treatment at the Kenilworth Place Clinic. MS, Sr., MS, Jr., and SS were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Evans' purported initial examinations on June 5, 2018 of MS, Sr., MS, Jr., and SS, Evans issued virtually identical preset prescriptions for Fraudulent Equipment to MS, Sr., MS, Jr., and SS that were provided to the Supplier Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; and (v) a bed board.

(ii)   On July 1, 2018, two Insureds – BC and EF– were involved in the same automobile accident. Thereafter, both BC and EF sought treatment at the Kenilworth Place Clinic. BC and EF were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Evans' purported initial examinations on July 5, 2018 of BC and Errol Roy Freeman, Evans issued similar preset prescriptions for Fraudulent Equipment to BC and EF that were provided to the Supplier Defendants, which included: (i) a lumbar support belt; (ii) a lumbar cushion; (iii) an egg crate mattress; and (iv) a bed board. Subsequent to purported follow-up examinations of BC on August 7, 2018 by Evans, and EF on August 29, 2018 by Frida Isakov, P.A. ("Isakov"), BC and EF were issued virtually identical prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants, which included: (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager; and (iv) a water circulating heat pad with pump.  On August 13, 2019, BC was issued the following prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants: (i) Evans issued a prescription for a cervical posture pump; and (ii) Isakov issued a prescription for a right knee orthosis (custom fitted), despite neither Evans nor Isakov performing a follow-up examination or any other service on BC on that day.  On September 20, 2018, Isakov issued two separate prescriptions in the name of EF for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); and (ii) a right knee orthosis (custom fitted), despite Isakov not performing a follow-up examination or any other service on EF on that day.

(iii)   On July 3, 2018, three Insureds – MS, SL, and TF – were involved in the same automobile accident. Thereafter, MS, SL, and TF all sought treatment at the Kenilworth Place Clinic. MS, SL, and TF were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Evans' purported initial examination on July 10, 2018 of Stephen Lauren, and Isakov's purported initial examinations on July 16, 2018 of MS and on July 27, 2018 of Tavon Forde, Evans and Isakov issued similar preset prescriptions for Fraudulent Equipment to MS, SL, and TF that were provided to the Supplier

Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; and (iv) a lumbar cushion. Subsequent to purported follow-up examinations of TF on May 29, 2019 by Evans, MS on September 6, 2018 by Isakov, and  SL on September 7, 2018 by Isakov, Evans and Isakov issued virtually identical prescriptions in the names of MS, SL, and TF for Fraudulent Equipment that was provided to the Supplier Defendants for: (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump. On August  28, 2018, Isakov issued three separate prescriptions in the name of TF for the following Fraudulent Equipment that were provided to the Supplier Defendants: (i) a LSO APL (custom fitted); (ii) a cervical posture pump; and (iii) a knee orthosis (custom fitted) despite Isakov not performing a follow-up examination or any other service on TF on that date.  On September 20, 2018, Isakov issued a prescription in the name of SL for the following Fraudulent Equipment that was provided to the Supplier Defendants: a LSO APL (custom fitted), and on October 3, 2018, Isakov issued a prescription in the name of SL for the following Fraudulent Equipment that was provided to the Supplier  Defendants: a knee orthosis (custom fitted), despite Isakov not performing a follow-up examination or any other service on Stephen Lauren on those dates.

(iv)     On November 10, 2018, two Insureds – ML and BB – were involved in the same automobile accident. Thereafter, ML and BB sought treatment at the Kenilworth Place Clinic. ML and BB were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Evans' purported initial examination on November 14, 2018 of ML, and Lucknie Ovincy, P.A.'s ("Ovincy") purported initial examination  of Benave  Brutus on November 15, 2018, Evans and Ovincy issued similar preset prescriptions for Fraudulent Equipment to ML and BB that were provided to the Supplier Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a bed board; and (vi) a whirlpool.

(v)     On January 13, 2019, three Insureds – AT, JS, and IR – were involved in the same automobile accident. Thereafter, AT, JS, and IR sought treatment at the Kenilworth Place Clinic. AT, JS, and IR were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Evans' purported initial examinations on January 22, 2019 of AT, JS, and IR, Mathew issued similar preset prescriptions for Fraudulent Equipment to AT, JS, and IR that were provided to the Supplier Defendants, which included: (i) a lumbar support belt; (ii) an egg crate mattress; (iii) a lumbar cushion; (iv) a whirlpool; and (v) a bed board.  On February 13, 2019, Evans issued two separate prescriptions each in the name of AT and JS for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); and (ii) a cervical posture pump, and a prescription in the name of IR for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) LSO APL (custom fitted), all despite Evans not performing a follow-up examination or any other service on AT, JS, and IR on that day.  Subsequent to a purported follow-up examination of IR on February 25, 2019, and a purported follow-up examination of AT on April 1, 2019, Mathew issued virtually identical prescriptions in the names of

IR and AT for Fraudulent Equipment that was provided to the Supplier Defendants for: (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.

(vi)     On February 10, 2019, three Insureds – RJ, AA, and MP – were involved in the same automobile accident. Thereafter, RJ, AA, and MP all sought treatment at the Kenilworth Place Clinic. RJ, AA, and MP were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Isakov's purported initial examinations on February 15,  2019 of RJ, AA, and MP, Isakov issued nearly identical preset prescriptions for Fraudulent Equipment to RJ, AA, and MP that were provided to the Supplier Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a bed board; (vi) a cervical pillow; and (vii) a whirlpool.  On March 21, 2019, Isakov issued two separate prescriptions each in the name of RJ, on April 4,  2019, Mathew issued two separate prescriptions each in the name of AA, and on April 25, 2019, Mathew issued two separate prescriptions each in the name of MP, all for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); and (ii) a cervical posture pump, despite Isakov and Mathew  not performing a follow-up examination or any other service on RJ, AA, and MP on those dates.

(vii)    On February 25, 2019, two Insureds – CC and CP – were involved in the same automobile accident. Thereafter, CC and CP both sought treatment at the Kenilworth Place Clinic. CC and CP were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Angella Pullock, N.P.'s ("Pullock") purported initial examination on March 1, 2019 of CP, and Mathew's purported initial examination on March 5, 2019 of Cornelius Grossman, Pullock and Mathew issued virtually identical preset prescriptions for Fraudulent Equipment to CC and CP that were provided to the Supplier Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a bed board; (vi) a cervical pillow; (vii) a whirlpool; (viii) an orthopedic positioning seat; and (ix) a knee support.  On March 21, 2019, Pullock issued three separate prescriptions each in the name of CP, for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); (ii) a cervical posture pump; and (iii) a knee orthosis (custom fitted) despite Pullock not performing a follow-up examination or any other service on CP on that date.  On April 4, 2019, Mathew issued a prescription in the name of CC for the following Fraudulent Equipment that was provided to the Supplier Defendants: a knee orthosis (custom fitted), and on April 25, 2018, Mathew issued two separate prescriptions each in the name of CC for the following Fraudulent Equipment that was provided to the Supplier  Defendants: (i) a LSO APL (custom fitted) and (ii) a cervical posture pump despite Mathew not performing a follow-up examination or any other service on CC on those dates.

(viii)   On March 24, 2019, three Insureds – DP, DS, and RM – were involved in the same automobile accident. Thereafter, DP, DS, and RM sought treatment at the

Kenilworth Place Clinic. DP, DS, and RM were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Mathew's purported initial examinations on March 27, 2019 of DP, DS, and RM, Mathew issued similar preset prescriptions for Fraudulent Equipment to DP, DS, and RM that were provided to the Supplier Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; and (vi) a cervical pillow.  On May 2, 2019, Mathew issued three separate prescriptions in the name of DS for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); (ii) a right knee orthosis, custom fitted; and (iii) a cervical posture pump, despite Mathew not performing a follow-up examination or any other service on DS on that day.  Subsequent to a purported follow-up examination of DS on May 6, 2019 by Schachter, Schachter issued a prescription in the name of DS for Fraudulent Equipment  that was provided to the Supplier Defendants for: (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.

(ix)    On April 10, 2019, two Insureds – ED and MC – were involved in the same automobile accident. Thereafter, ED and MC sought treatment at the Kenilworth Place Clinic. ED and MC were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Mathew's purported initial examinations on April 11, 2019 of ED and MC, Mathew issued nearly identical preset prescriptions for Fraudulent Equipment to ED and MC that were provided to the Supplier Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; (v) a whirlpool; and (vi) a cervical pillow.

(x)     On April 19, 2019, two Insureds – JC and FB – were involved in the same automobile accident. Thereafter, JC and FB sought treatment at the Kenilworth Place Clinic. JC and FB were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, subsequent to Evans' purported initial examinations on April 22, 2019 of JC and FB, Evans issued similar preset prescriptions for Fraudulent Equipment to JC and FB that were provided to the Supplier Defendants, which included: (i) a cervical collar, two-piece; (ii) a lumbar support belt; (iii) an egg crate mattress; (iv) a lumbar cushion; and (v) a bed board. On May 17, 2019, Evans issued two separate prescriptions each in the name of JC and FB for the following Fraudulent Equipment that was provided to the Supplier Defendants: (i) a LSO APL (custom fitted); and (ii) a cervical posture pump, despite Evans not performing a follow-up examination or any other service on JC and FB on that date.  Subsequent to a purported follow-up examination of JC and FB on May 29, 2019, Evans issued virtually identical prescriptions in the names of JC and FB for Fraudulent Equipment that was provided to the Supplier Defendants for: (i) a TENS unit; (ii) an infrared heat lamp; (iii) a massager: and (iv) a water circulating heat pad with pump.

191.     These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" where two or more Insureds were involved in the same underlying accident were treated at the Kenilworth Place Clinic, healthcare providers including Mathew and Evans virtually always prescribed multiple prescriptions for virtually identical Fraudulent Equipment despite the fact that the Insureds were differently situated.

192.     In further keeping with the fact that each prescription for Fraudulent Equipment issued from a healthcare provider at the Kenilworth Place Clinic was not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical collars and back support braces routinely contravened the Insureds' conservative treatment plans. For example, Mathew and Evans systemically prescribed cervical collars and lumbar support braces, and occasionally knee support braces, which immobilize the patient while directing the Insureds to undergo physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine. In this context, the prescriptions for cervical collars, back support braces, and knee support braces completely contravened the mobilizing physical therapy treatments also prescribed by the same healthcare provider. No legitimate treatment regimen would involve the simultaneous prescription of mobilizing physical therapy and immobilizing devices.

193.     Furthermore, and in keeping with the fact that the prescriptions issued by Mathew and Evans to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, many of the prescriptions issued by Mathew and Evans contained photocopied signatures.

194.     As part of the fraudulent scheme, Mathew and Evans, or someone else at their direction, used previously signed prescriptions that were then duplicated and modified to include

the patients' name and date of the prescription, while the signature of Mathew or Evans remained the same.

195.   For example, and as explained in more detail below, many of the claims for Fraudulent Equipment identified in Exhibit "1" were based upon unlawfully duplicated prescription forms that were previously filled out and signed by Mathew or Evans. Thereafter, the unlawfully duplicated prescription forms would be sent to the Supplier Defendants, pursuant to the predetermined fraudulent protocol, and used as the basis to submit fraudulent charges identified in Exhibit "1".

196.   No legitimate physician, chiropractor, other licensed healthcare provider would provide or permit a prescription form containing a signature to be photocopied and used as the basis for providing a prescription to another patient.

197.   Furthermore, Evans knowingly provided laypersons at the Kenilworth Place Clinic with her signature stamp to permit laypersons to issue prescriptions for Fraudulent Equipment from the Kenilworth Place Clinic, a vast majority of which were signed using a signature stamp.

198.   Additionally, as part of the fraudulent scheme, the prescriptions issued by healthcare providers at the Kenilworth Place Clinic, including Mathew and Evans, were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Kenilworth Place Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

199.   Additionally as part of the fraudulent scheme, the prescriptions issued by Mathew and Evans were purposefully generic and vague so as to allow the Supplier Defendants to choose

the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

200.    By way of example, rather than specifying the type of back support brace and knee support braces that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – the healthcare providers at the Kenilworth Place Clinic including Mathew and Evans simply issued prescriptions containing the phrase "lumbar support belt w/hot & cold therapy" with the intent of enabling the Supplier Defendants to select a specific type of support brace that was more highly priced and profitable, instead of issuing prescriptions for support braces that were actually needed in the first instance.

### D.    The Unlawful Distribution of Fraudulent Equipment to Insureds by the Supplier Defendants Without Valid Prescriptions

201.    Wallegood is not a licensed medical professional corporation, and Chernyshev is not a licensed healthcare provider. As such, the Supplier Defendants were not lawfully permitted to prescribe DME and OD to Insureds. For the same reason, the Supplier Defendants cannot properly dispense DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

202.    However, in many of the fraudulent claims identified in Exhibit "1", the Supplier Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider. More specifically, the prescriptions for DME and/or OD provided to the Supplier Defendants from the Referral Defendants and other healthcare providers were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Supplier Defendants to a unique type of DME and/or OD.

203.    The vague and generic prescriptions from the Referral Defendants – and other healthcare providers – was intended to and actually provided the Supplier Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

204.    The Referral Defendants – and other healthcare providers – intended to issue vague and generic prescriptions to and actually provided the Supplier Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

205.    In a legitimate clinical setting, a DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient. Upon information and belief, the Supplier Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Supplier Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

206.    For example, the prescriptions issued by the healthcare providers at the Clinics, including Keum, Pak, Mathew, and Evans, requested a "lumbar support belt w/hot & cold therapy" or a "lumbar support".  A "lumbar support belt" or "lumbar support" corresponds to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

    (i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)     HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)     HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)   HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii)  HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)     HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)   HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)  HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)   HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)    HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)  HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)    HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)  HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

207.    As unlicensed healthcare providers, the Supplier Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "lumbar support belt w/hot & cold therapy" or "lumbar support".

208.    However, without contacting the prescribing healthcare provider, including the Referral Defendants, based upon a prescription for an "lumbar support belt w/hot & cold therapy", the Supplier Defendants simply provided virtually every Insured with the same lumbar orthotic and billed GEICO using HCPCS Code L0627 requesting a reimbursement of $322.98 for each unit, which resulted in hundreds of needlessly inflated charges to GEICO.

209.    In reality, the Supplier Defendants unlawfully prescribed the Fraudulent Equipment because for virtually all of the claims identified in Exhibit "1", the Supplier Defendants decided which specific items of DME and/or OD to provide to the Insureds.

210.    The Fraudulent Equipment provided to the Insureds identified in Exhibit "1" – to the extent that the Fraudulent Equipment was actually provided – by the Supplier Defendants were not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) the medical necessity of the specific items dispensed in relation to the Insureds. Rather, the decisions by the Supplier Defendants were solely based on their own financial enrichment. As a result, the Supplier Defendants were never eligible for reimbursement of No-Fault Benefits.

**E.      The Supplier Defendants' Fraudulent Billing for DME and/or OD**

211.    The bills submitted to GEICO and other New York automobile insurers by the Supplier Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

212.    In the bills and other documents submitted to GEICO, the Supplier Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to the unlawful financial

arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, either directly or through third-parties who are not presently known.

213.   Further, the Supplier Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

214.   Moreover, and as explained below, the bills submitted to GEICO by the Supplier Defendants misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

> **1)   The Supplier Defendants' Fraudulently Misrepresented the Fee Schedule items Purportedly Provided**

215.   When the Supplier Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

216.   As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

217.   Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

218.    By submitting bills to GEICO containing specific HCPCS Codes the Supplier Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

219.    However, with the exception of codes relating to positioning pillows/cushions under HCPCS Code E0190, eggcrate mattresses under HCPCS Code E0199, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Supplier Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

220.    The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Supplier Defendants' submitted bills to GEICO containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

221.    As indicated above, the predetermined fraudulent protocols due to unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, provided the Supplier Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

222.    Accordingly, the Referral Defendants and other healthcare providers purposefully provided prescriptions to the Supplier Defendants that contained general categories of Fraudulent Equipment to purportedly provide to the Insureds.

223.    Based upon the vague and generic prescriptions that the Supplier Defendants received, the Supplier Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

224.    Although several options were available to the Supplier Defendants based upon the vague and generic prescriptions, the Supplier Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

225.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Supplier Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

226.    For example, as identified in the claims contained within Exhibit "1", the Supplier Defendants used the vague and generic language in the prescriptions to bill GEICO for hundreds of lumbar orthotics under HCPCS Code L0627 with a charge of $322.98 per unit.

227.    However, the bills to GEICO for HCPCS Code L0627 fraudulently misrepresented the type of Fraudulent Equipment the Supplier Defendants purportedly provided to Insureds as the lumbar orthotics they provided – to the extent that the lumbar orthotics were actually provided – were not reimbursable under HCPCS Code L0627.

228.    HCPCS Code L0627 is a Fee Schedule item and is defined as follows:

> Lumbar orthosis, sagittal control, with rigid anterior and posterior panels, posterior extends from L-1 to below L-5 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated item that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise.

229.    Essentially, the product assigned to HCPCS Code L0627 is a back brace with rigid panels for the anterior and posterior parts of the lumbar spine that has been customized to fit a specific patient by an individual with expertise.

230.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code L0627, the specific lumbar orthotic provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any lumbar orthotics – did not contain the requirements set forth in HCPCS Code L0627.

231.    Upon information and belief, the lumbar orthotics provided – to the extent that any were provided – were flexible materials that would have been properly billed under HCPCS Code L0625, which is a Fee Schedule item defined as follows:

> Lumbar Orthosis, flexible, provides lumbar support, posterior extends from L-1 to below L-5 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include pendulous abdomen design, shoulder straps, stays, prefabricated, off-the-shelf

232.    By contrast to the fraudulent charges for $322.98 for each LSO under HCPCS Code L0627 – and in keeping with the fact that the fraudulent charges were part of the Supplier Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement amount of $43.27 for each unit under HCPCS Code L0625.

233.    In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code L0627, each of the bills fraudulently misrepresented that the Supplier Defendants provided the Insureds with equipment that satisfied the requirements of HCPCS Code L0627.

234.    In keeping with the fact that the claims identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0637, and L1832 fraudulently misrepresented that the Supplier Defendants satisfied all the requirements for the billed HCPCS

Code, upon information and belief, the Supplier Defendants did not, and could not have, custom-fitted the OD as required.

235.    To the extent that any of the charges identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0637, and L1832, were provided, the Supplier Defendants did not customize the equipment as required by Palmetto.

236.    In order to help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

237.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

238.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the

expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

239.     In the claims identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0637, and L1832, the Supplier Defendants fraudulently misrepresented that the OD was custom-fitted, as defined by Palmetto, and was done so by a certified orthotist.

240.     Instead, to the extent that the Supplier Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0627, L0637, and L1832, the Supplier Defendants dropped off the Fraudulent Equipment without taking any action to custom-fit the OD. To the extent that the Supplier Defendants attempted to make any adjustments to the Insureds identified in Exhibit "1" that received custom-fitted OD, the Supplier Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

241.     In keeping with the fact that the Supplier Defendants misrepresented that they custom-fitted the Insureds for the OD billed to GEICO, Chernyshev is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

242.     To the extent that Chernyshev had any interaction with the Insureds identified in Exhibit "1" regarding the OD billed to GEICO, Chernyshev would use the Insured's height and

weight to determine the sizing of a brace (in a Small, Medium, Large, or Extra Large sizing scale) of an off-the-shelf brace, then adjust the straps to tighten the brace to the Insured. Such actions are consistent with minimal self-adjustment, as defined by Palmetto, and fail to comply with the requirements for HCPCS Codes containing a custom-fit requirement.

243.    The claims identified in Exhibit "1" for HCPCS Code E2601 is another example of how the Supplier Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

244.    Each of the claims identified within Exhibit "1" for HCPCS Code E2601 contained a charge for $55.29 based upon a prescription for a "lumbar cushion."

245.    However, the product represented by HCPCS Code E2601 is defined as a wheelchair seat cushion that is less than 22" in width.

246.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2601, the items provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions meant for use with a wheelchair.

247.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibit "1", who were provided with a cushion by the Supplier Defendants that was billed to GEICO under HCPCS Code E2601, were in a wheelchair.

248.    To the extent that any items were actually provided to the Insureds for the charges identified in Exhibit "1" under HCPCS Code E2601, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

249.     Unlike the fraudulent charges for $55.29 for each lumbar cushion billed under HCPCS Code E2601 – and in keeping with the fact that the fraudulent charges were part of the Supplier Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

250.     In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code E2601, each of the bills fraudulently misrepresented that the Supplier Defendants provided the Insureds with equipment in response to a prescription for a wheelchair cushion and that item satisfies the requirements of HCPCS Code E2601.

251.     Furthermore, the claims identified in Exhibit "1" for cervical collars under HCPCS Codes L0174 is another example of how the Supplier Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that Fraudulent Equipment were actually provided.

252.     Similar to the charges under HCPCS L0627, the Supplier Defendants used the vague and generic language in the prescriptions to bill GEICO for hundreds of cervical collars under HCPCS Code L0174 with a charge of $130.00 per unit.

253.     However, the bills to GEICO for "cervical collar (2 pc)" under HCPCS Code L0174 fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the cervical collars they provided – to the extent that the cervical collars were actually provided – were not reimbursable under HCPCS Code L0174.

254.     HCPCS Code L0174 is a Fee Schedule item and is defined as follows:

> Cervical, collar, semi-rigid, thermoplastic foam, two piece with thoracic extension, prefabricated, off-the-shelf

255.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code L0174, the specific cervical collar provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any lumbar orthotics – did not contain the requirements set forth in HCPCS Code L0174.

256.    Upon information and belief, the cervical collars provided – to the extent that any were provided – were single piece flexible foam cervical collars that would have been properly billed under HCPCS Code L0120, which is a Fee Schedule item defined as follows:

Cervical, flexible, non-adjustable, prefabricated, off-the-shelf (foam collar)

257.    By contrast to the fraudulent charges for $130.00 for each cervical collar under HCPCS Code L0174 – and in keeping with the fact that the fraudulent charges were part of the Supplier Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement amount of $6.80 for each unit under HCPCS Code L0120.

258.    In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code L0174, each of the bills fraudulently misrepresented that the Supplier Defendants provided the Insureds with equipment that satisfied the requirements of HCPCS Code L0174.

259.    With the exception of the claims identified using HCPCS Codes E0190 and E0199, in each of the claims for Fee Schedule items identified within Exhibit "1", to the extent that any Fraudulent Equipment was actually provided, the Supplier Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and where therefore not eligible to collect No-Fault Benefits in the first instance.

> 2) **The Supplier Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items**

260.   When the Supplier Defendants' submitted bills to GEICO for Non-Fee Schedule items the Supplier Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

261.   As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as <u>the lesser of</u>: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

262.   By submitting bills to GEICO for Non-Fee Schedule items, the Supplier Defendants represented that they requested permissible reimbursement amounts that were calculated as <u>the lesser of</u>: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

263.   However, in virtually all of the charges to GEICO identified in Exhibit "1" for Non-Fee Schedule items, the Supplier Defendants fraudulently represented to GEICO that the reimbursement sought was <u>the lesser of</u>: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

264.   Instead, the Supplier Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

265.   The Supplier Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

266.     When the Supplier Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Supplier Defendants' acquisition cost of purportedly high-quality items. In actuality, the Supplier Defendants' legitimate acquisition cost for the low-quality items were significantly less.

267.     In an effort to further their scheme, upon information and belief, the Supplier Defendants, never researched the cost to the general public of the low-cost and low-quality Non-Fee Schedule items purportedly provided to the Defendants.

268.     Upon information and belief, the Supplier Defendants never researched the cost to the general public of the Non-Fee Schedule items that they purportedly provided because they knew that those items would be sold at significantly less than charges they submitted to GEICO, and other automobile insurers.

269.     In keeping with the fact that the Supplier Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Supplier Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

270.     Upon information and belief, the Supplier Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

271.     To the extent that the Supplier Defendants did submit invoices in conjunction with their bills to GEICO, upon information and belief, those invoices did not accurately represent the legitimate cost to acquire the Non-Fee Schedule items.

272.     As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

273.     For example, the Supplier Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with a charge of $259.65 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

274.     During GEICO's investigation into the Supplier Defendants, GEICO was able to observe the infrared heat lamps purportedly provided to the Insureds, which were billed under HCPCS Code E0205, and observed that the infrared heat lamps were low-quality items made in China. Upon further investigation, GEICO determined that the exact same low-quality model for the infrared heat lamps provided to Insureds were available for purchase to the general public on the internet on Ebay for $16.00.

275.     In virtually all of the charges submitted to GEICO for infrared heat lamps, the Supplier Defendants fraudulently sought reimbursement for $259.65 per unit when the maximum reimbursement charge was no greater than the cost to the general public at a price of $16.00 per unit.

276.     Similarly, the Supplier Defendants billed GEICO for hundreds of water circulating pumps under HCPCS Code E1399 with a charge of $232.50 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

277.     During GEICO's investigation into the Supplier Defendants, GEICO was able to observe the water circulating pumps purportedly provided to the Insureds, which were billed under HCPCS Code E1399, and observed that the water circulating pumps were low-quality items made in China. GEICO also determined that a virtually identical low-quality model for the water

circulating pumps provided to Insureds were available for purchase to the general public on the internet on eBay between $15.00 and $28.95.

278.    In virtually all of the charges submitted to GEICO for water circulating pumps, the Supplier Defendants fraudulently sought reimbursement for $232.50 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $28.95 per unit.

279.    The Supplier Defendants' also billed GEICO for hundreds of massagers under HCPCS Code E1399 with a charge of $229.50 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

280.    During GEICO's investigation into the Supplier Defendants, GEICO was able to observe the massagers purportedly provided to the Insureds, which was billed under HCPCS Code E1399, and observed that the massagers were low-quality items made in China. GEICO also determined that the exact same low-quality model massagers were available for purchase to the general public on the internet at both ComfortMarket.com and UnbeatableSale.com for $18.90.

281.    In virtually all of the charges submitted to GEICO for massagers, the Supplier Defendants fraudulently sought reimbursement for $229.50 per unit when the maximum reimbursement charge was no-greater than the cost to the general public at $18.90 per unit.

282.    In each of the claims identified within Exhibit "1" for Non-Fee Schedule items, the Supplier Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Non-Fee Schedule items were the lesser of 150% of the acquisition cost or the cost to the general public, and where therefore not eligible to collect No-Fault Benefits in the first instance.

**III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

283.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Wallegood, seeking payment for Fraudulent Equipment.

284.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)      The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Supplier Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with the healthcare providers, including the Referral Defendants, either directly or through third-parties who are presently unknown; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(ii)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Supplier Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Supplier Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Supplier Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amount for Non-Fee Schedule items identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

285.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

286.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

287.    Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided to the Supplier Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

288.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

289.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

290.    Additionally, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Supplier Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in

order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

291.   Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Supplier Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

292.   Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

293.   GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

294.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

295.   The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

296. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $171,000.00 based upon the fraudulent charges.

297. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Wallegood**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

298. GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 297 of this Complaint as if fully set forth at length herein.

299. There is an actual case in controversy between GEICO and Wallegood regarding more than $468,000.00 in fraudulent billing that has been submitted to GEICO in the name of Wallegood.

300. Wallegood has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

301. Wallegood also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich Wallegood, the other Defendants, and others who are not presently known, rather than to treat the Insureds.

302. Wallegood has no right to receive payment for any pending bills submitted to GEICO because Wallegood purportedly provided Fraudulent Equipment as a result of decisions

made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

303.    Wallegood has no right to receive payment for any pending bills submitted to GEICO because – to the extent Wallegood actually provided any Fraudulent Equipment – Wallegood fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

304.    Wallegood has no right to receive payment for any pending bills submitted to GEICO because – to the extent Wallegood provided any Fraudulent Equipment – Wallegood fraudulently misrepresented the permissible reimbursement rate for Non-Fee Schedule items as they submitted bills to GEICO with prices that were significantly more than the lesser of 150% of the legitimate acquisition cost or the price to the general public for each item.

305.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Wallegood.

### SECOND CAUSE OF ACTION
#### Against Chernyshev
#### (Violation of RICO, 18 U.S.C. § 1962(c))

306.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 297 of this Complaint as if fully set forth at length herein.

307.    Wallegood is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

308.    Chernyshev knowingly conducted and/or participated, directly or indirectly, in the conduct of Wallegood's affairs through a pattern of racketeering activity consisting of repeated

violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately two years seeking payments that Wallegood was not eligible to receive under the New York No-Fault Laws because: (i) Wallegood submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Wallegood submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Wallegood submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Wallegood actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Wallegood actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

309. Wallegood business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chernyshev operates Wallegood, insofar as Wallegood is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Wallegood to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts

of mail fraud implies a continued threat of criminal activity, as does the fact that Chernyshev continues to submit and attempt collection on the fraudulent billing submitted by Wallegood to the present day.

310.   Wallegood is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.   These inherently unlawful acts are taken by Wallegood in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

311.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $171,000.00 pursuant to the fraudulent bills submitted through Wallegood.

312.   By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Chernyshev, Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

313.   GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 297 of this Complaint as if fully set forth at length herein.

314.   Wallegood is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

315.   Chernyshev, Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Med Equipment enterprise.

316.   Chernyshev, Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Wallegood's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Wallegood was not eligible to receive under the New York No-Fault Laws because: (i) Wallegood submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Wallegood submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Wallegood submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Wallegood actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Wallegood actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

317.    Chernyshev, Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

318.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $171,000.00 pursuant to the fraudulent bills submitted through Wallegood.

319.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Wallegood and Chernyshev**
**(Common Law Fraud)**

320.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 297 of this Complaint as if fully set forth at length herein.

321.    Wallegood and Chernyshev intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

322.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many

claims, to the extent that any Fraudulent Equipment was actually provided, that the Fee Schedule items accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fee Schedule items did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for Non-Fee Schedule items contained in the bills to GEICO misrepresented the permissible reimbursement amount.

323.    Wallegood and Chernyshev intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Wallegood that were not compensable under the No-Fault Laws.

324.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $171,000.00 pursuant to the fraudulent bills submitted by the Supplier Defendants through Wallegood.

325.    The Supplier Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

326.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Wallegood and Chernyshev**
**(Unjust Enrichment)**

327.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 297 of this Complaint as if fully set forth at length herein.

328.    As set forth above, the Supplier Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

329.    When GEICO paid the bills and charges submitted by or on behalf of Wallegood for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Supplier Defendants' improper, unlawful, and/or unjust acts.

330.    The Supplier Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Supplier Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

331.    The Supplier Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

332.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $171,000.00.

## SIXTH CAUSE OF ACTION
### Against Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10
### (Aiding and Abetting Fraud)

333.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 297 of this Complaint as if fully set forth at length herein.

334.    Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme perpetrated against GEICO by the Supplier Defendants.

335.    The acts taken by Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme include knowingly: (i) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants as a result of unlawful financial arrangements; (ii) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants pursuant to predetermined fraudulent protocols and without regard for medical necessity; (iii) provided prescriptions for Fraudulent Equipment that were intentionally generic and vague so as to allow the Supplier Defendants to unlawfully decide the specific type of

Fraudulent Equipment to purportedly provide Insureds, and subsequently bill GEICO; (iv) participated in each of the foregoing acts with knowledge that the prescriptions would be used by the Supplier Defendants to support their fraudulent claims; and (iv) ensured that the prescriptions for Fraudulent Equipment were given to the Supplier Defendants rather than to the patients.

336.    The conduct of Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10, as more fully described above, were in furtherance of the fraudulent scheme and were significant and material.

337.    The conduct of Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10, as more fully described above, were a necessary part of and were critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for the Supplier Defendants to bill GEICO for Fraudulent Equipment.

338.    Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 each aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for Fraudulent Equipment that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

339.    The conduct of Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 caused GEICO to pay money based upon the fraudulent charges submitted to it through Wallegood in an amount to be determined at trial, but in no event less than $171,000.00.

340.    The extensive fraudulent conduct of Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10 demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

341. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### JURY DEMAND

342. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A. On the First Cause of Action against Wallegood, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Wallegood has no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of action against Chernyshev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $171,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Chernyshev, Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $171,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Wallegood and Chernyshev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $171,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Wallegood and Chernyshev, more than $171,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.     On the Sixth Cause of Action against Keum, Pak, Mathew, Evans, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $171,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: April 13, 2021
       Uniondale, New York

                              RIVKIN RADLER LLP


                              By:    /s/ Barry I. Levy
                                   Barry I. Levy (BL 2190)
                                   Michael A. Sirignano (MS 5263)
                                   Michael Vanunu (MV 4167)
                                   Philip P. Nash (PN 0519)
                              926 RXR Plaza
                              Uniondale, New York 11556
                              (516) 357-3000

                              *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*